UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK _____X

JAMES BRUNO, ROBERT BURNS, LOUIS
CASTIGLIONE, KEVIN CAVANAUGH, BRIAN
COMPASSO, WAYNE COMPASSO, JOHN GILLEN,
JOSEPH JOCKEL, MARIANNE AGNELLO, DIANNE
MONDELLO, VERNON ALLEN JONES, JOHN
O'CONNOR, THOMAS O'CONNOR, JOSEPH RUSSO,
PETER SENATORE, MATTHEW SEXTON, LAWRENCE
SMITH, PHILIP F. FAHEY, ENZO RIVERS, CARLIEF
VOZZO, CARLO CILIBERTI, GLENN A. SOBECKI,
JOHN K. DIFFLEY, KEVIN O'CONNOR, CHRISTOPHER
J. EDGE, ROBERT EMMERICH, LUIS MENDOZA, SEAN
A. O'BRIEN, CHARLES J. HENSEL, DONNA NICHOLS
n/k/a DONNA SANDERS, and JAMES CRUICKSHANK,
on behalf of themselves and all others similarly situated,

CASE NO: _____

**CLASS ACTION
COMPLAINT**

                              Plaintiffs,

- vs –

The HOLY SEE, a/k/a the APOSTOLIC SEE,

_____ Defendant. _____X

PLAINTIFFS JAMES BRUNO, ROBERT BURNS, LOUIS CASTIGLIONE, KEVIN
CAVANAUGH, BRIAN COMPASSO, WAYNE COMPASSO, JOHN GILLEN,  JOSEPH
JOCKEL, MARIANNE AGNELLO, DIANNE MONDELLO, VERNON ALLEN JONES, JOHN
O'CONNOR, THOMAS O'CONNOR, JOSEPH RUSSO,  PETER SENATORE, MATTHEW
SEXTON, LAWRENCE SMITH, PHILIP F. FAHEY, ENZO RIVERS, CARLIEF VOZZO,
CARLO CILIBERTI, GLENN A. SOBECKI, JOHN K. DIFFLEY, KEVIN O'CONNOR,
CHRISTOPHER J. EDGE, ROBERT EMMERICH, LUIS MENDOZA, SEAN O'BRIEN,
CHARLES J. HENSEL, DONNA NICHOLS n/k/a DONNA SANDERS, and JAMES
CRUICKSHANK (collectively "PLAINTIFFS"), on behalf of themselves and all others similarly
situated (the "CLASS"), by their attorneys, HERMAN LAW, as and for their Class Action
Complaint against DEFENDANT, the HOLY SEE a/k/a the APOSTOLIC SEE, allege as follows:

## INTRODUCTION

1.      This is a class action lawsuit against the HOLY SEE for victims of childhood clergy

sexual abuse.

2.      This class action seeks money damages for the negligence of the HOLY SEE in

mandating a policy for its Bishops and Dioceses of secrecy and concealment in response to



allegations and reports of child sexual abuse by Catholic clergy.  This mandatory secrecy policy, imposed on threat of excommunication, bound Bishops and Dioceses for decades if not centuries. As a result of this policy, child sexual abuse by Catholic clergy developed and continued as a pervasive and systemic problem in the Catholic Church, in which perpetrators were protected and victims were silenced.  This mandatory policy adhered to by Bishops' and Dioceses' in the United States created a foreseeable risk of clergy sexual abuse.

3.      The PLAINTIFFS and class members are victims of clergy sexual abuse who are eligible to bring claims under the New York Child Victims Act, C.P.L.R. § 214-g.   The claims asserted in this Complaint are for money damages against the HOLY SEE.

## PARTIES, JURISDICTION AND VENUE

4.      PLAINTIFF JAMES BRUNO is an adult male, age 63, citizen of New York. Plaintiff was sexually abused when he was approximately 12-13 years old, in or about 1969-1970 by Father Rocco Verrengio when he was assigned to St. Rita's Roman Catholic Church within the Diocese of Brooklyn.  James was an altar boy at the Church, and Father Verrengio gained access to James through James' role as altar boy.  Father Verrengio is on the Diocese of Brooklyn's published list of priests against whom credible allegations of sexual abuse have been made.

5.      PLAINTIFF ROBERT BURNS is an adult male, age 61, citizen of Maryland. Plaintiff was sexually abused when he was approximately 14 years old, in or around 1973 by Father Thomas O'Rourke when he was assigned to American Martyrs Roman Catholic Church within the Diocese of Brooklyn.  Father O'Rourke groomed Thomas and his family when Thomas's brothers served as altar boys at the Church, and he officiated at Thomas's sister's wedding.  He established a relationship with Thomas and then sexually abused him.      Father O'Rourke has had multiple

allegations of child sexual abuse against him, and is on the Diocese of Brooklyn's published list of priests against whom credible allegations of sexual abuse have been made

6.      PLAINTIFF LOUIS CASTIGLIONE is an adult male, age 62, citizen of New York. Plaintiff was sexually abused when he was approximately 8-9 years old, in or around 1967-1969 by Father Joseph Said when he was assigned to St. Charles Church within the Diocese of Brooklyn. Louis served as an altar boy at St. Charles Church when he encountered and was sexually abused by Father Said.

7.      PLAINTIFF KEVIN CAVANAUGH is an adult male, age 58, citizen of Florida. Plaintiff was sexually abused when he was approximately 11-13 years old, in or around 1973-1976, by Father Edward Maurer when he was assigned to Our Lady Queen of Martyrs within the Diocese of Brooklyn.   Kevin was an altar boy in the Church when Father Maurer groomed and then sexually abused him.  Father Maurer has had multiple allegations of child sexual abuse against him, and is on the Diocese of Brooklyn's published list of priests against whom credible allegations of sexual abuse have been made

8.      PLAINTIFF BRIAN COMPASSO is an adult male, age 59, citizen of Florida. Plaintiff was sexually abused when he was approximately 15-16 years old, in or around 1976-1977 by Deacon Eugene Vollmer when he was assigned to St. Joseph Catholic Church within the Diocese of Rockville Centre. Brian attended a prayer group of the Church's youth organization that Deacon Vollmer led or facilitated.  By virtue of this position, Deacon Vollmer groomed Brian and his brother, gained their trust, and then sexually abused them.  Deacon Vollmer has had multiple allegations of child sexual abuse against him. (See ¶ 26 below).

9.      PLAINTIFF WAYNE COMPASSO is an adult male, age 60, citizen of North Carolina. Plaintiff was sexually abused when he was approximately 16-17 years old, in or around

1976-1977 by Deacon Eugene Vollmer when he was assigned to St. Joseph Catholic Church within the Diocese of Rockville Centre. Wayne attended a prayer group of the Church's youth organization that Deacon Vollmer led or facilitated.  By virtue of this position, Deacon Vollmer groomed Wayne and his brother, gained their trust, and then sexually abused them.

10.     PLAINTIFF JOHN GILLEN is an adult male, age 41, citizen of Florida. Plaintiff was sexually abused several times beginning when he was 12 years old, in or around 1992 by Deacon Charles Di Targiani who was his 7th Grade Teacher at the time at St. Ephrem Catholic Church and School within the Diocese of Brooklyn.   John was an altar boy at the Church.  Deacon Di Targiani was the youth minister at the Church and John's confirmation teacher.

11.     PLAINTIFF JOSEPH JOCKEL is an adult male, age 45, citizen of California. Plaintiff was sexually abused when he was approximately 16-17 years old, in or around 1991-1992 by Father James Miller when he was assigned to St. John the Baptist Diocesan High School within the Diocese of Rockville Centre. Father Miller groomed and sexually abused Joseph in his role as chancellor or counselor at the High School.  Father Miller has had multiple allegations of child sexual abuse against him, and is on the Diocese of Rockville Centre's published list of priests against whom credible allegations of sexual abuse have been made.

12.     PLAINTIFF MARIANNE AGNELLO is an adult female, age 62, citizen of New York.  Plaintiff was sexually abused when she was approximately 11-12 years old, in or about 1968 by Father Edward Brennan, who was assigned to Good Shepherd Church within the Diocese of Brooklyn. Father Brennan groomed and sexually abused Marianne when she was a student at Good Shepherd School, beginning at her first communion. when he asked her parents if he could take a photograph with her.  Father Brennan has had multiple allegations of child sexual abuse

against him and is on the Diocese of Brooklyn's published list of priests against whom credible allegations of sexual abuse have been made.

13.     PLAINTIFF DIANNE MONDELLO is an adult female, age 61, citizen of New York.  Plaintiff was sexually abused when she was approximately 10 years old, in or about 1968 by Father Edward Brennan, who was assigned to Good Shepherd Church within the Diocese of Brooklyn.   Father Brennan groomed and sexually abused Dianne when she was a student at Good Shepherd School. Father Brennan mentored students at the School, which he used as a means of grooming leading to sexual abuse.

14.     PLAINTIFF VERNON ALLEN JONES is an adult male, age 54, citizen of New York. Vernon was sexually abused when he was approximately 12 years old, in or around 1975 by Father Brian Callahan when he was assigned to the Church of St. Michael and St. Edward within the Diocese of Brooklyn. Vernon was baptized by Father Callahan in 1977, and served as an altar boy in the Church.  Vernon also volunteered for a student job in the rectory, where he was sexually abused by Father Callahan.  Father Callahan has had multiple allegations of child sexual abuse against him, and is on the Diocese of Brooklyn's published list of priests against whom credible allegations of sexual abuse have been made.

15.     PLAINTIFF JOHN O'CONNOR is an adult male, age 55, citizen of California. Plaintiff was sexually abused when he was approximately 14-15 years old, in or around 1979-1980 by Father Joseph P. Byrns when he was assigned to St. Anastasia Roman Catholic Church within the Diocese of Brooklyn. John was an altar boy at the Church serving Father Byrns.  Father Byrns also had contacts with John as the baseball coach at the Church.  Father Byrns has had multiple allegations of child sexual abuse against him and is on the Diocese of Brooklyn's published list of priests against whom credible allegations of sexual abuse have been made.

16.     PLAINTIFF THOMAS O'CONNOR is an adult male, age 53, citizen of Florida. Plaintiff was sexually abused when he was approximately 11-12 years old, in or around 1978-1979 by Father Joseph P. Byrns when he was assigned to St. Anastasia Roman Catholic Church within the Diocese of Brooklyn.  Thomas was a student at the parish school, where he became acquainted with Father Byrns, who would mentor students in the school.  Father Byrns used this position to groom and sexually abuse Thomas.  This abuse escalated as Thomas became an altar boy at the Church.

17.     PLAINTIFF JOSEPH RUSSO is an adult male, age 58, citizen of New York. Plaintiff was sexually abused when he was approximately 13-14 years old, in or around 1976-1977 by Deacon Eugene C. Vollmer when he was assigned to St. Joseph Catholic Church within the Diocese of Rockville Centre.  Joseph met then Deacon Vollmer at a Church prayer meeting conducted by Father Vollmer, which was also attended by the Compasso brothers (¶¶ 10-11 above).

18.     PLAINTIFF PETER SENATORE is an adult male, age 48, citizen of New York. Plaintiff was sexually abused when he was approximately 14 years old, in or about 1985 through 1986 by Father Frank Capellupo, who was assigned to Most Precious Blood Church within the Diocese of Brooklyn.  Father Capellupo groomed Peter and developed a relationship with him in 7th grade when Peter was a student at Most Precious Blood School. Father Capellupo has had multiple allegations of child sexual abuse against him, and is on the Diocese of Brooklyn's published list of priests against whom credible allegations of sexual abuse have been made.

19.     PLAINTIFF MATTHEW SEXTON is an adult male, age 43, citizen of New York. Plaintiff was sexually abused when he was approximately 13 years old, in or around 1990 by Father Eugene Vollmer, who was assigned to Our Lady of Victory Church within the Diocese of

Rockville Centre. Matthew served Father Vollmer as an altar boy in Our Lady of Victory Church, which gave Father Vollmer access to Matthew for sexual abuse.  Father Vollmer has had multiple allegations of child sexual abuse against him, and was identified as a sexual abuse perpetrator in the Grand Jury Report, Suffolk County Supreme Court, Special Grand Jury, Term 1D, May 6, 2002.

20.     PLAINTIFF LAWRENCE SMITH is an adult male, age 73, citizen of Jalisco, Mexico. Plaintiff was sexually abused when he was approximately  14-15 years old, in or around 1962 by multiple priests, including Father John H. Maurer when he was assigned to Our Lady of the Miraculous Medal Church and Father James Sickler when he was assigned to Pancras Church within the Diocese of Brooklyn.  Father Maurer and Father Sickler groomed Lawrence and developed a relationship with him when as a child he was assigned to play the pipe organ and sing in the Church choir.  Each of Father Maurer and Father Sickler has had multiple allegations of child sexual abuse against him, and is on the Diocese of Brooklyn's published list of priests against whom credible allegations of sexual abuse have been made.

21.     PLAINTIFF PHILIP F. FAHEY is an adult male, age 54, citizen of New York, who was sexually abused in multiple incidents when he was about 8 or 9 years old in approximately 1975-76, by Father Robert Ferro, a priest of the Diocese of Brooklyn then assigned to St. Ephrem Parish.  Philip was active in parish youth activities, and through these activities Father Ferro became acquainted with Philip and groomed him.   Father Ferro first sexually abused Philip after his CCD class in a classroom at St. Ephrem.  Father Ferro has had multiple allegations of child sexual abuse against him and is on the Diocese of Brooklyn's list of priests against whom credible allegations of sexual abuse have been made.

22.     PLAINTIFF ENZO RIVERS is an adult male age 68, citizen of New York. Plaintiff was sexually abused by three priests when he was between the approximate ages of 6 and 16, including Father John H. O'Brien and Father Brian F.X. Callahan, who were priests of the Diocese of Brooklyn.  Father O'Brien was then assigned to St. James Roman Catholic Church  and Father Callahan was assigned to St. Michael – St. Edwards Roman Catholic Church.  Plaintiff grew up in a very large, devout Catholic family.  His mother would seek financial assistance for the family from different Churches in Brooklyn and would bring Enzo to the Churches where the offending priests would interact with him.    Father Callahan has had multiple allegations of child sexual abuse against him and is on the Diocese of Brooklyn's list of priests against whom credible allegations of sexual abuse have been made.

23.     PLAINTIFF CARLIEF VOZZO is an adult male age 51 citizen of New York. Plaintiff was sexually abused from the approximate ages of 10-12 in or about 1979-81 by Father James Lara, a priest of the Diocese of Brooklyn assigned to St. Francis Xavier Church in Brooklyn. Carlief was active in parish-sponsored youth activities, and through these activities Father Lara became acquainted with Carlief and groomed him for sexual abuse.  Father Lara has had multiple allegations of child sexual abuse against him and is on the Diocese of Brooklyn's list of priests against whom credible allegations of sexual abuse have been made.

24.     PLAINTIFF CARLO CILIBERTI is an adult male age 62 citizen of Arizona. Plaintiff was sexually abused when he was approximately 12-16 years old in or about 1973-77 by Father Gerard J. Chasse, a priest of the Diocese of Rockville Centre who was assigned to St. Luke's Church in Brentwood, New York. Carlo was an altar boy at St. Luke's, and he served Father Chasse and other priests in the Church.  Father Chasse groomed Carlo through their altar server – priest relationship, and sexually abused him on the premises of the Church among other places.



Father Chasse is serial child sex abuser identified as a sexual abuse perpetrator in the 2003 Suffolk County Grand Jury Report, and is on the Diocese of Rockville Centre's list of priests against whom credible allegations of sexual abuse have been made.

25.     PLAINTIFF GLENN A. SOBECKI is an adult male, age 57, citizen of New York. Plaintiff was sexually abused when he was approximately 13-14 years old, in or around 1960-1961, by Father Harold Paul, a priest of the Diocese of Rockville Centre assigned to Holy Family Catholic Church in Hicksville, New York.  Glenn came to Father Paul for counseling, and by means of their counseling sessions Father Paul groomed and sexually abused Glenn.  Father Paul has had multiple allegations of child sexual abuse against him and is on the Diocese's published list of priests against whom credible allegations of sexual abuse have been made.

26.     PLAINTIFF JOHN K. DIFFLEY is an adult male, age 64, citizen of New York. Plaintiff was sexually abused for a period of years beginning in approximately 1968 when he was about 11 years old by Father James J. Bergin, a priest of the Diocese of Rockville Centre assigned to St. Anthony of Padua Roman Catholic Church. John was an altar boy and performed work around the Church.   Father Bergin has had multiple allegations of child sexual abuse against him and is on the Diocese's published list of priests against whom credible allegations of sexual abuse have been made.

27.     PLAINTIFF KEVIN O'CONNOR is an adult male, age 56, citizen of New York. Plaintiff was sexually abused when he was approximately 12-13 years old, in or around 1972-1973, by Father Joseph P. Byrns, a priest of the Diocese of Brooklyn assigned to St. Anastasia Roman Catholic Church.  The abuse began when Kevin was an altar boy and member of the baseball team coached by Father Byrns.  Father Byrns is a serial sexual predator, and also sexually abused Plaintiffs John O'Connor, Thomas O'Connor and Robert Emmerich.

28.     PLAINTIFF, CHRISTOPHER J. EDGE, is an adult male, age 52, citizen of South Carolina. Plaintiff was sexually abused in numerous incidents when he was approximately 7 to 9 years old, in or around 1976-1977, by Father James T. Smith, a priest of the Diocese of Brooklyn assigned to Our Lady of Hope Church in Middle Village, Queens.  Father Smith would, among other things, remove Christopher from Sunday School class and abuse him in his office.  He also sexually abused Christopher at a home in Amityville, where Father Smith brought children for sexual abuse.   Father Smith has had multiple allegations of child sexual abuse against him and is on the Diocese of Brooklyn's published list of priests against whom credible allegations of sexual abuse have been made.

29.     PLAINTIFF, ROBERT EMMERICH, is an adult male, age 57, citizen of New York.  Plaintiff was sexually abused when he was approximately 13-14 years old, in or around 1977-1978, by Father Joseph P. Byrns, a priest of the Diocese of Brooklyn assigned to St. Anastasia Church.  Robert was active in the Church.  He and his group of friends were groomed by Father Byrns and sexually abused.

30.     PLAINTIFF LUIS MENDOZA is an adult male, age 52, citizen of Virginia. Plaintiff was sexually abused when he was approximately 12-13 years old, in or around 1981-1983, by Father Brian F.X., Callahan, a priest of the Diocese of Brooklyn assigned to the Church of St. Michael and St. Edwards Church.  Luis was an altar boy at the Church and Father Callahan used his relationship with Luis as altar server to commit acts of sexual abuse.   Father Callahan was a serial sexual predator; he also sexually abused Plaintiff Enzo Rivers.

31.     PLAINTIFF SEAN O'BRIEN is an adult male, age 50, citizen of North Carolina. Plaintiff was sexually abused in multiple incidents when he was approximately 11-12 years old, in or around 1981-1982, by Father John J. McGeever, a priest of the Diocese of Rockville Centre



assigned to St. Agnes Cathedral. Sean was an altar boy, and Father McGeever conducted altar boy training.  Father McGeever used his position and authority with Sean as altar boy to sexually abuse him.  Father McGeever has had multiple allegations of child sexual abuse against him and is on the Diocese of Rockville Centre's published list of priests against whom credible allegations of sexual abuse have been made.

32.     PLAINTIFF CHARLES J. HENSEL is an adult male, age 65, citizen of Virginia. Plaintiff was sexually abused when he as approximately 11-12 years old, in or around 1968-1969, by Father James J. Bergin, a priest of the Diocese of Rockville Centre assigned to St. Anthony of Padua Roman Catholic Church. Charles was an altar boy at St. Anthony of Padua and served Father Bergin.  Father Bergin was a serial sexual predator; he also sexually abused Plaintiff John Diffley.

33.     PLAINTIFF DONNA NICHOLS n/k/a DONNA SANDERS is an adult female, age 66, citizen of New York.  Plaintiff was sexually abused for a period of years beginning when she was approximately 11years old, in or around 1965, by Father Nicholas J. Unterstein, a priest of the Diocese of Rockville Centre assigned to St. Hugh of Lincoln Roman Catholic Church.  Upon information and belief, Father Unterstein was laicized in or about 1980.  Father Unterstein has had multiple allegations of child sexual abuse against him and is on the Diocese of Rockville Centre's published list of priests against whom credible allegations of sexual abuse have been made.

34.     PLAINTIFF JAMES CRUICKSHANK is an adult male, age 46, citizen of New York.  Plaintiff was sexually abused when he was approximately 13-15 years old, in or around 1989-1991, by Father James C. Miller, a priest of the Diocese of Rockville Centre  assigned to St. John the Baptist High School in West Islip, NY. Plaintiff was a student in the School. Father Miller would pull James out of class for "counseling," and then sexually abuse him. Father Miller has had multiple allegations of child sexual abuse against him and is on the Diocese of Rockville

Centre's published list of priests against whom credible allegations of sexual abuse have been made.

35.     Defendant the HOLY SEE a/k/a the APOSTOLIC SEE (the "HOLY SEE") is an agency or instrumentality of a foreign state, the Vatican City State, a sovereign territory located within the city of Rome, Italy.   The HOLY SEE is the government of the Catholic Church worldwide.   It is a separate entity which serves as an organ of the Vatican City State.   The HOLY SEE is a citizen or subject of the Vatican City State.

36.     Alternatively, the HOLY SEE is itself a foreign state, located in Vatican City, Rome.

37.     As either a foreign state, or the agency or instrumentality of a foreign state, the HOLY SEE may be sued in accordance with the Foreign Sovereign Immunities Act, 28 U.S.C. sec. 1602 *et seq*.

38.     The Court has jurisdiction over this action pursuant 28 U.S.C. § 1332(a)(2) as this is an action between citizens of a state and a citizen or subject of a foreign state in which the matter in controversy exceeds $75,000.

39.     The Court alternatively has original and personal jurisdiction pursuant to 28 U.S.C. § 1330, as PLAINTIFFS assert claims for relief in personam for which the Defendant is a foreign state as defined in 28 U.S.C. § 1603(a) and (b), and is not entitled to immunity under 28 U.S.C. §§ 1605-1607 nor under any applicable international agreement.

40.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(c)(3) as the Defendant is not resident in the United States, or alternatively pursuant to 28 U.S.C. §§ 1330(b) and 1391(b)(3) as the Defendant is subject to personal jurisdiction in this district, or alternatively

pursuant to 28 U.S.C. § 1391(b)(2) or 28 U.S.C. § 1391(f) as a substantial part of the events or omissions giving rise to the claims occurred in this district.

## ALLEGATIONS SUPPORTING CLAIMS

**A.      Agency Relationship Between Defendant HOLY SEE and Catholic Bishops**

41.      The Papacy, or the office of the Pope, known as the Supreme Pontiff, operates and controls the HOLY SEE.   The Pope is assisted in the administration of the HOLY SEE and the world-wide Roman Catholic Church by the Roman Curia, which is the administrative headquarters of the HOLY SEE.

42.      The HOLY SEE and its relationship to the Vatican City State are unique and atypical.   The HOLY SEE runs, directs, supervises and oversees the business, activities, organizations, agents and employees of the worldwide Roman Catholic Church.  The HOLY SEE, either as a foreign state itself, or alternatively as an agent or instrumentality of the Vatican City State, maintains diplomatic relations and enters into treaties and agreements with other nation states, including the United States.

43.      The HOLY SEE is governed as a hierarchy, wherein all power and control in the governmental system descends from the top, the office of the Pope, downward.  In the HOLY SEE, executive, legislative and judicial authority is concentrated in the office of the Pope.  The Pope has the right to plenary control and is the ultimate authority for all decision making concerning the HOLY SEE and the activities of the worldwide Catholic Church.

44.       The Catholic Church is divided into geographic territories or sections it identifies as dioceses and archdioceses.  The dioceses are operated by bishops.  An archdiocese is a primary diocese in a region identified as a province, headed by an archbishop.  An archbishop holds a position of honor among bishops of dioceses, but his position is parallel to that of the diocesan



bishops in that an archbishop does not exercise authority over a bishop.  Archbishops and bishops, also known as Ordinaries, have authority to conduct the activities of the Catholic Church in their respective territories under the direction and complete, plenary control of the HOLY SEE (herein dioceses and archdioceses are collectively referred to as "Dioceses," and bishops and archbishops are collectively referred to as "Bishops").

45.    The HOLY SEE has substantial involvement in, and the unqualified right to, control the day-to-day business and operations of its agents and instrumentalities, including the conduct of Diocesan activities by Bishops.  The Holy See has the right of complete domination of the Bishops and Dioceses, operating them as a single enterprise.

46.    The HOLY SEE operates in part from funds raised by Dioceses for its sole benefit, which is a major source of revenue.  The Dioceses are obligated to provide funds to support the HOLY SEE, which funds are provided by the donations of members and parishioners in the Dioceses.    Fundraising for the HOLY SEE is accomplished, for example, through a program known as Peter's Pence, which is coordinated between the HOLY SEE and Bishops, among other agents and employees of the HOLY SEE.

47.    The HOLY SEE operates a charitable organization, the Pontifical Society for the Propagation of the Faith, which operates in each Diocese and raises funds for the Catholic Church's worldwide missionary work, among other things.  Funds donated to the Society for the Propagation of the Faith are sent to the Pontifical Mission Societies in the United States, headquartered in New York City.

48.    A Diocese is created by the Pope.  No other official or body in the Catholic Church has this authority.

49.     A Bishop is appointed by the Pope.  No other official or body in the Catholic Church has this authority.

50.     The Pope is the supreme legislator of the Catholic Church, including its Dioceses. The Pope alone has the authority to enact laws and interpret laws governing the Church and its activities.  While a Bishop has authority to legislate within the territory of a Diocese, this authority is limited by the Pope and must be consistent with any papal policy statements.  Papal policy statements are distributed by the office of the Pope to the Bishops, who are responsible for implementing them and communicating them to the Catholic faithful or directing that they be maintained in secrecy.

51.     The Pope is also the supreme administrator of all Church property, including property that is nominally in the name of a Diocese or entity created by a Diocese.

52.      The Pope is the direct and immediate supervisor of Bishops in the Church hierarchy.  Only the Pope has the authority to select, consecrate or ordain a Bishop, assign a Bishop to a Diocese, transfer a Bishop, remove a Bishop from office, allow a Bishop to retire, or accept a Bishop's resignation, among other things.   The Pope alone determines the specific requirements for serving as a Bishop.  The office of Bishop does not exist independently from the HOLY SEE, nor does it have any meaning outside of the structure and hierarchy of the Catholic Church.  A Bishop is entirely dependent upon the Pope for the exercise of the Bishop's power and authority in his Diocese.  The Pope determines the extent and limits of a Bishop's authority and establishes the relationship of Bishops to the Papacy.

53.     The Dioceses operate as divisions of the Holy See, with no separable existence apart from the Holy See.  The Holy See exercises direct control of Dioceses and Bishops through, inter alia, policies and directives that are mandatory.   To the extent that the Dioceses are separate



corporations, only the Holy See has the authority to create, terminate or otherwise make decisions concerning the existence and structure of these corporations. The Bishops consent to act in accordance with the Holy See's policies and directives, and are subject to being removed from their position by the Pope if they fail to do so.

54.     A Bishop of a Diocese is required to submit detailed reports concerning the Diocese to the HOLY SEE every five years, known as Quinquennial Reports. This Report is presented to the Pope in a mandatory official visit by the Bishop to the Vatican. A Bishop is otherwise required to send reports and other information concerning the activities or business of the Diocese to the HOLY SEE on demand.

55.     The Pope requires that a Bishop take the "Oath of Fidelity" to the HOLY SEE. As the name indicates, the Oath is a promise of total fidelity to the Pope. The failure to comply with the Oath would be a basis for the Pope to use his authority to remove the Bishop.

56.     The three primary positions of authority in the Church are Deacons, Priests and Bishops. Deacons and Priests are approved for ministry and are "ordained," which is the educational and ceremonial process by which individuals become Deacons and Priests. The office of the Bishop is the highest of what are known as "holy orders." The Bishop is selected, appointed and assigned only by the Pope. A Bishop is the superior of all Priests and other clergy assigned to work within his Diocese. This includes Priests ordained in the Diocese, Priests of a Catholic religious order, and Priests from other Dioceses working in the Diocese.

57.     The HOLY SEE has ultimate authority in the investigation and response to allegations of child sexual abuse by Catholic Priests. A Bishop has authority conferred by the Pope to respond to such allegations, subject to the Pope's right to intervene directly in personnel matters concerning any Catholic clergy, including Diocesan and religious order Priests working in

the territory of a Diocese.     The office of the Pope promulgates and officially publishes rules, procedure and regulation that pertain to the investigation and response to reports of sexual abuse. The application of these rules is not optional but mandatory for all Bishops.

58.     For example, in 2010 Pope Benedict XVI revised a Papal Decree, known as a Motu Proprio, *i.e.*, a worldwide order to Bishops and other Church officials, first issued by Pope John Paul II in 2001, which established procedures for prosecuting and disciplining priests accused of sexual abuse.  Among other things, this Decree amended the procedure for laicization of a priest and directed who may serve on Diocesan tribunals in sex abuse cases.    It specifically directed and controlled the manner in which Bishops and Dioceses handled their priests accused of child sexual abuse.

**B.     The Mandatory Secrecy Policy of the HOLY SEE**

59.     The HOLY SEE has known for centuries that Catholic priests were using their positions and roles in Catholic parishes and schools to sexually molest children.    At all relevant times, this was a widespread, ubiquitous and systemic problem in the Catholic Church.

60.     The first formal legislations referring to sexual abuse by clerics dates from the Synod of Elvira which took place in the year 309.  In the 11th century, St. Peter Damien composed a book, Liber Gomorrhianus (Book of Gomorrah), addressed to then Pope Leo IX.  The book is a denunciation against sexual immorality in the Church.  It condemns as epidemic among clerics in the Church "sodomy," which encompasses acts of sexual abuse of boys and adolescents.  It advocates for the enforcement of severe punishment of the offending clerics, including public humiliation, required fasting, imprisonment in a monastic cell, and custody of the cleric by two monks to prevent future child sexual abuse offenses.

61.     The problem of child sexual abuse in the Church nonetheless has continued for centuries, prompting the issuance of policies and standards dictating how Bishops were to respond to allegations of child sexual abuse by Catholic clergy.  In 1866 the HOLY SEE issued express instructions to Bishops requiring strict secrecy and perpetual silence concerning allegations of child sexual abuse.  These instructions applied to all individuals in the Church having or acquiring knowledge of allegations of child sexual abuse under the penalty of excommunication.  This instruction was reiterated and developed in further detail in documents issued by the HOLY SEE in 1922, 1962, 2001 and 2010.

62.     In 1922, the HOLY SEE released a confidential document to Bishops and other Church officials regarding the handling of cases of solicitation of sex in the confessional and other offenses by clergy.  This document mandated a specific procedure for the Bishop to follow, bound by the requirement of strict secrecy.

63.     The official name of this confidential document is the *Instruction on The Manner of Proceeding in Cases of Solicitation* (The Vatican Press, 1922) (hereinafter referred to as "Crimen Sollicitationis".  The heading of the document states, "From the Supreme and Holy Congregation of the Holy Office To All Patriarchs, Archbishops, Bishops and Other Diocesan Ordinaries . . . ."  It contains specific instructions regarding the handling of child sex abuse by clergy.  According to the document itself, it is an "instruction, ordering upon those to whom it pertains to keep and observe it in the minutest detail."  Crimen Sollicitationis, ¶ 11.  It sets forth the following secrecy requirement:

> What is treated in these cases has to have a greater degree of care and observance so that those same matters be pursued in a most secretive way, and, after they have been defined and given over to execution, they are to be restrained by a perpetual silence. (Instruction of the Holy Office, February 20, 1867, n. 14).  Each and everyone pertaining to the tribunal in any way or admitted to


VOICE FOR VICTIMS
HERMAN LAW

> knowledge of the matters because of their office, is to observe the strictest secret, which is commonly regarded as a secret of the Holy Office, in all matters and with all persons, under the penalty of excommunication *latae sententiae,* ipso facto and without any declaration [of such a penalty] having been incurred and reserved to the sole person of the Supreme Pontiff, even to the exclusion of the Sacred Penitentiary, are bound to observe [this secrecy] inviolably.

Crimen Sollicitationis, ¶ 11.  This same document was reissued in substantially the same form by the HOLY SEE on March 16, 1962.

64.     While the title of the 1922 and 1962 documents refers to solicitation of sex in the confessional, the scope of these documents actually encompasses four separate and distinct offenses:  (1) solicitation of sex in the sacramental confession; (2) homosexual sex; (3) sexual abuse of minors; and (4) bestiality.  The confidential decree set forth in Crimen Sollicitationis, binding and mandatory on the Bishops, expressly incorporates these offenses, including sexual acts with "youths of either sex."   Its secrecy mandate applies to such acts by clergy irrespective of where they occur.  Crimen Sollicitationis, Title V, ¶ 73.

65.     The HOLY SEE's mandatory policy of secrecy under penalty of immediate removal from the Church (excommunication) applies to all those involved in any way with the investigation or processing of a complaint of sexual abuse under the 1922 and 1962 documents. The penalty of automatic excommunication applies to all clerics involved.  This penalty may also be imposed on lay persons involved in a case.  The grave obligation of absolute and perpetual secrecy applies to all.  Through this policy and others, implemented by the Bishops, the HOLY SEE condoned and enabled child sex abuse by Catholic clergy working in the territory of a Diocese.

66.     Crimen Sollicitationis reflected a specific procedure and policy that Bishops were required to follow without material discretion, on penalty of excommunication.  Compliance with



this secrecy policy mandated, among other things, that Bishops (i) not disclose allegations of clergy sexual abuse to law enforcement; (ii) direct victims and their families to not report incidents of clergy sexual abuse to law enforcement; and (iii) provide no warning or disclosure that may protect other Catholic parishioners and students from sexual abuse.  The HOLY SEE's secrecy policy mandated that the Bishop follow a specific course of action in response to an allegation of child sexual abuse.

67.     The policy of secrecy and the severest of penalties for its violation set forth in Crimen Sollicitationis were reiterated in subsequent documents issued by the HOLY SEE to its Bishops in 2001 and 2010.  The policy provided that an office of the HOLY SEE, the Congregation for the Doctrine of the Faith, was authorized to act in cases of child sexual abuse by ordained clergy.    Under the 2001 policy, Bishops are required to report any priest accused of sexual misconduct to this office of the HOLY SEE.

68.     The HOLY SEE has the right to control the organizational body of U.S. Bishops, known as the U.S. Conference of Catholic Bishops (USCCB).  Upon information and belief, policy or legislation proposed by the USCCB is subject to approval by the HOLY SEE, particularly that concerning the handling of allegations of clergy sex abuse.  In 2018, the HOLY SEE directed that the USCCB table a proposal the USCCB was prepared to vote on and approve that would have established standards for clergy conduct and a process for the evaluation of Bishops in complying with these standards.  In May 2019, the Pope issued a Motu Proprio which set forth standards and procedures for response to allegations of clergy sex abuse.    The Bishops of the USCCB are required to comply with the Motu Proprio.

69.      At all relevant times, the Dioceses' acts and omissions were subject to the HOLY SEE'S direction and control.  Specifically, the HOLY SEE had the right to direct the Bishops how

to respond to an allegation or report of clergy sexual abuse of a child.  As demonstrated by the above-described policy statements, the HOLY SEE did so direct the Bishops to respond by maintaining the strict secrecy of the allegations under penalty of removal and excommunication.

70.     The strict secrecy mandate was contrary to applicable law and/or legal duty requiring that allegations of clergy-on-child sexual abuse be reported to law enforcement.  For example, the Bishops who controlled Catholic parochial schools in their territory had a duty to report to law enforcement when they had reasonable cause to suspect that a child was abused or maltreated.  This duty arose pursuant to law, including without limitation, New York Social Services Law § 413.

71.     In December 2019 the Pope issued a directive to Bishops abolishing the pontifical secrecy requirement in connection with reporting, trials and decisions in cases of child sexual abuse.   Under this directive the Pope reversed the HOLY SEE's prior instructions to Bishops stating, among other things, that confidentiality under canon law  does "not prevent the fulfillment of the obligations laid down in all places by civil laws,"  and that those reporting the crime of child sexual abuse, the victim and witnesses "shall not be bound by any obligation of silence." This reversal further demonstrates the strict control exercised by the HOLY SEE over Bishops, particularly as to the secrecy requirements for allegations of child sexual abuse.

72.     At all relevant times, as reflected by its mandatory policy, the HOLY SEE was aware that a highly significant number of priests were engaging in sexual misconduct with children.  The priests who were serial child sex abusers, some of whom were eventually placed on Dioceses' published lists of priests credibly accused of child sexual abuse (*see* ¶¶ 4-34 above), represent a phenomenon that was well known to the HOLY SEE.   These priest-perpetrators were

enabled and emboldened by the mandatory secrecy policy in committing acts of child sexual abuse in their Dioceses, especially in connection with the Church's youth-related functions and activities.

### C.    Non-Immunity of the HOLY SEE Under 28 U.S.C. § 1605(a)

73.    This action is for money damages sought against the HOLY SEE for personal injuries occurring in the United States.  The mandatory secrecy policy of the Holy See was established, implemented and enforced entirely in the United States through the HOLY SEE's agents and employees, the Bishops.

74.    The personal injuries of PLAINTIFFS and the CLASS claimed herein were caused by the tortious acts or omissions of the Bishops, who at all relevant times were officials of the HOLY SEE.  Alternatively, the Bishops were at all relevant times employees of the HOLY SEE under New York law and general common law because they performed services in the affairs of the HOLY SEE, and the conduct of their performance of such services was subject to the HOLY SEE's control or right of control. At all relevant times, the Bishops were acting within the scope of their office or employment.

75.    The claim for relief set forth herein is based upon the exercise or performance of mandatory duties or functions required of the Bishops by the HOLY SEE.  In particular, the HOLY SEE imposed mandatory policies that required the Bishops to maintain the strict secrecy of allegations and reports of clergy sex abuse.  The Bishops had no discretion to deviate from this secrecy policy and were forbidden by the HOLY SEE from disclosing or reporting clergy sex abuse.

76.    The Bishops' response to allegations or reports of child sexual abuse by clergy had no element of independent decision making or considerations of public policy or morals.   The

Bishops were forbidden from taking actions or making decisions in noncompliance with the secrecy mandates of the HOLY SEE.

77. Because of the secrecy mandate, priests who were child sexual predators were able to proceed with their heinous acts knowing that they would not be reported to law enforcement and that anyone in the Church who gained knowledge of their acts would be required to maintain secrecy. The HOLY SEE's secrecy and concealment policy enabled and emboldened child sexual predators among clergy working in the Dioceses, creating an environment and system in which they could engage in child sexual abuse with impunity. As a result, children encountering clergy in the Dioceses were placed at foreseeable risk of child sexual abuse by clergy sexual predators.

**D.      The Child Victims Act and New York Dioceses' Compensation Programs**

78. In February 2019, New York enacted the Child Victims Act (CVA), which in relevant part revived civil claims for injuries suffered as a result of conduct which would constitute a sexual offense under certain enumerated penal laws applicable to the sexual abuse or exploitation of children less than 18 years of age. *See* CPLR 214-g. The CVA included a "window" in which these claims may be brought that commenced on August 14, 2019, and by amendment continues for a period of two years.

79. Prior to enactment of the CVA, the Dioceses located in the State of New York instituted programs or plans in which victims of child sexual abuse by clergy could make claims and receive some compensation for their damages.

80. In 2016, the Archdiocese of New York announced the launch of its Independent Reconciliation and Compensation Program (IRCP), directed toward the numerous victims of child sexual abuse by clergy working within its territory. The Archdiocese appointed third-party Administrators for the IRCP, Kenneth R. Feinberg and Camille S. Biros. Under the IRCP, victims



submitted claims to the Administrators.  The claims were investigated and offers were made by the Administrators for settlement of the claims.

81.     Essentially the same IRCP was instituted by each of the Diocese of Brooklyn, Diocese of Rockville Centre, Diocese of Syracuse and Diocese of Ogdensburg.  As with the Archdiocese of New York, the IRCPs for these Dioceses were administered by Kenneth R. Feinberg and Camille S. Biros.

82.     The Diocese of Buffalo initiated an IRCP in 2018, administered by former state court Judges.    The Diocese of Albany began a compensation program in 2004.  The Diocese of Rochester also instituted its own compensation program in 2018.

83.     In each of the IRCPs and compensation programs, the Diocese's objective was to obtain releases from victims of clergy sexual abuse preventing them from bringing their claims in court.  The settlements required that the victim execute a release in favor of the Diocese and parish in exchange for the compensation being paid.

84.     The IRCPs and other compensation programs instituted by the Dioceses located in the State of New York were a response to legislative initiatives in New York State that would revive claims for child sexual abuse that had been barred by the expiration of the statute of limitations, which ultimately resulted in enactment of the CVA.  The programs were designed to settle claims at a substantial discount on the premise that the claims would remain barred by the statute of limitations and the victims had no recourse to file their claims in court.

85.     The settlement programs were successful in securing releases from victims of clergy sexual abuse in favor of the Dioceses in the State of New York.  Upon information and belief, at least 1,300 victims of clergy sex abuse have executed such releases, receiving approximately $250 million on their claims.

86.     Given the purpose and intent of the settlement programs, the victims of child sexual abuse settling their claims in these programs received only a small fraction of the damages to which they would have been entitled in a court of law.     Upon information and belief, the releases executed by each of the Plaintiff and members of the CLASS do not release the Defendant HOLY SEE.

87.     Subsequent to the opening of the "window" under the Child Victims Act, numerous survivors of child sexual abuse who were abused by Catholic clergy serving in Dioceses, parishes and Catholic schools in the State of New York, and who did not execute releases in any of the settlement programs or otherwise, have brought Child Victims Act claims against those Dioceses, parishes and schools.   This includes Plaintiffs Philip F. Fahey, Enzo Rivers and Carlief Vozzo.

### E.     Nature of Conduct Causing Injuries to PLAINTIFFS and the CLASS

88.     PLAINTIFFS and the members of the CLASS all suffered physical, psychological and emotional injuries as a result of conduct which constitutes a sexual offense on a minor as defined in Article 130 of the New York Penal Law or use of a child in a sexual performance as defined in Section 263.05 of the New York Penal Law, including without limitation, conduct constituting rape  (consisting of sexual intercourse) (N.Y. Penal Law §§ 130.25 – 130.35); criminal sexual act (consisting of oral or anal sexual conduct) (N.Y. Penal Law §§ 130.40 – 130.53); and/or sexual abuse (consisting of sexual contact) (N.Y. Penal Law §§ 130.55 – 130.77).

89.     The PLAINTIFFS and the CLASS all have claims for negligence set forth herein that were previously time barred and qualify for the revival of the statute of limitations pursuant to CPLR 214-g.



## CLASS ACTION ALLEGATIONS

90.     This action is brought and may properly be maintained as a class action under the provisions of Rule 23(b)(3) of the Federal Rules of Civil Procedure.

91.     All Plaintiffs bring this action on behalf of a class defined as victims-survivors of childhood sexual abuse by Catholic clergy serving in the State of New York, in the territories of the Archdiocese of New York, Diocese of Brooklyn, Diocese of Rockville Centre, Diocese of Albany, Diocese of Rochester, Diocese of Syracuse, Diocese of Buffalo and Diocese of Ogdensburg, whose claims fall within the scope of the New York Child Victims Act, CPLR 214-g (the "CLASS").

92.     In addition, the named Plaintiffs with the exception of Philip F. Fahey, Enzo Rivers and Carlief Vozzo, are identified as the "IRCP SUBCLASS," and bring claims on behalf of a class identified as victims-survivors of childhood sexual abuse by Catholic clergy serving in the State of New York, in the territories of the Archdiocese of New York, Diocese of Brooklyn, Diocese of Rockville Centre, Diocese of Albany, Diocese of Rochester, Diocese of Syracuse, Diocese of Buffalo and Diocese of Ogdensburg, who have claims that may be brought under the New York Child Victims Act, CPLR 214-g, and who entered into monetary settlements in an IRCP, other victim compensation program, or otherwise settled their claims against the Dioceses, received monetary compensation, and executed releases of the paying Dioceses.

93.     In addition, Philip F. Fahey, Enzo Rivers and Carlief Vozzo are identified as the "NON-IRCP SUBCLASS," and bring claims on behalf of a class identified as victims-survivors of childhood sexual abuse by Catholic clergy serving in the State of New York, in the territories of the Archdiocese of New York, Diocese of Brooklyn, Diocese of Rockville Centre, Diocese of Albany, Diocese of Rochester, Diocese of Syracuse, Diocese of Buffalo and Diocese of



Ogdensburg, who have claims that may be brought under the New York Child Victims Act, CPLR 214-g, and who did not enter into any monetary settlements in an IRCP or other victim compensation program, receive monetary compensation, and execute releases of the paying Dioceses through such a program.

94.     The members of this putative CLASS, IRCP SUBCLASS and NON-IRCP SUBCLASS are so numerous that separate actions or joinder of parties, whether required or permitted, is impracticable.

95.     There are questions of law and fact common to the CLASS and the SUBCLASSES that predominate over any questions affecting only individual members.  These include the scope of the agency relationship between the HOLY SEE and the Dioceses; the HOLY SEE's actual control and right to control the operations and activities of the Bishops and Dioceses; whether the Bishops are officials or employees of the HOLY SEE under principles of New York law;  whether the policies and directives issued by the HOLY SEE are required to be followed by the Bishops and their Dioceses; whether the secrecy policy issued by the HOLY SEE reflected, for example, in the 1922 and 1962 documents, was a mandatory policy required to be followed by the Bishops and the Dioceses; whether the Bishops had discretion to give notice, warning or disclosure of allegations of child sexual abuse against clergy working in their Dioceses with access to children; whether the Bishops who controlled Catholic parochial schools in their territory had a duty to report clergy sexual abuse of children to law enforcement pursuant to law, including without limitation, Social Services Law § 413; whether the Bishops had a duty to warn or disclose allegations of child sexual abuse against clergy working in their Dioceses with access to children; whether the Bishops breached this duty to warn, report or disclose, as agents and employees of the HOLY SEE, by following the mandatory policy of the HOLY SEE;  whether the resulting secrecy

surrounding reports and allegations of child sexual abuse by Catholic clergy perpetuated an environment and system in which child sexual abuse by clergy could be committed without adverse consequence to the perpetrators; whether clergy sexual abuse of children was condoned and enabled by the shroud of secrecy created by the HOLY SEE policy; and whether the HOLY SEE'S secrecy policy was thus a substantial factor in causing the child sexual abuse of the PLAINTIFFS and the CLASS.

96.      The claims of PLAINTIFFS are typical of the claims of the CLASS, in that they all have claims that qualify under the revival statute, Section 214-g of the Civil Practice Law and Rules, which allow their claims against the HOLY SEE to be filed and prosecuted at this time in that they were all sexually abused as children by Catholic clergy in the State of New York.   As to the IRCP SUBCLASS, they all presented claims to IRCP or other compensation programs instituted by the respective Dioceses; they all received some monetary compensation on their claims within the compensation program; and they all executed releases in substantially the same form which released the Diocese but did not release the HOLY SEE.   As to the NON-IRCP SUBCLASS, they all have claims under the revival statute and did not participate in and execute releases pursuant to a Diocese compensation program.

97.      A class action is superior to other available methods for the fair, just, and efficient adjudication of the claims asserted herein.   Joinder of all the members of the CLASS is impracticable and it would be impractical for individual members of the CLASS to pursue separate claims.   At the same time, the CLASS members, while numerous, are identifiable as they each submitted and released claims in claims settlement programs instituted by the Dioceses.   Moreover, prosecution of separate actions by individual members of the CLASS would create the risk of varying and inconsistent adjudications and would unduly burden the courts.

98.     Given the costs of service and individual litigation,  and the complexity associated with a claim subject to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605, multiple individual actions face significant barriers that would generally leave CLASS members without a remedy against the HOLY SEE, and would thus deny them the opportunity to obtain the full measure of their damages arising from child sexual abuse.  A CLASS action is an efficient device for litigating these claims, as it will conserve the resources of the courts and the parties.

99.     PLAINTIFFS have no interest antagonistic to the interests of the other members of the CLASS with respect to this action or the claims for relief herein.

100.     PLAINTIFFS are committed to the vigorous prosecution of this action and have retained competent legal counsel.

101.     HERMAN LAW is experienced in group/class claims and the representation of victims-survivors of childhood sexual abuse.

102.     HERMAN LAW devotes its practice to the representation of victims of sexual abuse in civil claims.   It has represented over 1,000 victims of sexual abuse in civil cases. HERMAN LAW has experience representing substantial groups of victims in clergy sexual abuse cases against entities of the Roman Catholic Church.

103.     PLAINTIFFS are adequate representatives of the CLASS, IRCP SUBCLASS and NON-IRCP SUBCLASS, and together with their attorneys, they are able to, and will fairly and adequately, protect the interests of these groups.

104.     PLAINTIFFS and their counsel anticipate no difficulty in the management of this litigation as a class action.

www.HermanLaw.com
Telephone: (212) 390-0100



VOICE FOR VICTIMS
HERMAN
LAW

## CLAIMS FOR RELIEF

### Negligence

105.     PLAINTIFFS and the CLASS repeat and reallege the allegations made in paragraphs 1 through 104 above.

106.     At all relevant times, the HOLY SEE owed a duty to PLAINTIFFS and the CLASS, who were among the Catholic faithful receiving ministry, pastoral and educational services from clergy of the Dioceses.   The HOLY SEE, through the Bishops and its Dioceses, was in a special relationship with PLAINTIFFS and the CLASS, and thus owed a duty to protect the child PLAINTIFFS and CLASS members from foreseeable harms.  This special relationship arose from, inter alia, the youth-serving functions of the Dioceses which the perpetrator priests used as a means to groom, gain access to, and sexually abuse children, including altar boy service, educational activities, and other Church-sponsored activities directed in whole or in part at children.

107.     The HOLY SEE and the Bishops were aware that a significant percentage of clergy were sexual predators molesting children.  By mandating secrecy in response to allegations of reports of child sexual abuse, the HOLY SEE through the Bishops created and fostered a child sex ring in the Church.

108.     The sexual abuse of PLAINTIFFS and the CLASS was within the category of foreseeable hazards resulting from the HOLY SEE's mandated policy of secrecy in response to allegations of clergy sexual abuse.  The secrecy of allegations of child sexual abuse against predator clergy created the risk that other children engaged in activities in the Church and exposed to predator clergy would be sexually abused.

109.     At all relevant times, the HOLY SEE knew or should have known that its strict secrecy policy would result in children in contact with Catholic clergy being sexually abused.



110.    The HOLY SEE breached its duty of care to PLAINTIFFS and the CLASS by instituting a policy of strict secrecy, with draconian consequences for its violation, preventing the Bishops from (i) warning the children and parents receiving the services of Catholic clergy and engaging in contacts with Catholic clergy of the foreseeable risk of child sexual abuse from such contacts; (ii) reporting or disclosing clergy sexual abuse of children to third parties, parents or others in a position to act to protect children from clergy sexual abuse; (iii) reporting known or suspected clergy sex abusers to law enforcement; and (iii) disclosing or reporting to persons serving in the Catholic schools and parishes that a clergyman assigned there was known or suspected of child sexual abuse, or was at risk of engaging in such conduct.

111.    The HOLY SEE's breach of duty was a substantial factor in causing the clergy sexual abuse of PLAINTIFFS and the CLASS, resulting in injuries to PLAINTIFFS and the CLASS.

112.    As a direct and proximate result of the HOLY SEE's negligence, Plaintiff and the CLASS members have each suffered and continue to suffer severe and permanent psychological, emotional and physical injuries, shame, humiliation and the inability to lead a normal life.

113.    The HOLY SEE's acts and omissions shows a reckless or willful disregard for the safety and well-being of children in the Catholic Church who were exposed to its clergy.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS respectfully request certification of one or more defined classes in accordance with Fed.R.Civ.P. 23(c); judgment for compensatory damages in favor of PLAINTIFFS and the CLASS; an award of attorney's fees and costs pursuant to Fed. R. Civ. P. 23(h) and Rule 909 of the New York Civil Practice Law and Rules; an award of punitive damages; and such other and further relief as is just and proper.



## DEMAND FOR JURY TRIAL

PLAINTIFFS demand a jury trial to the extent that any of their claims are so triable.

Dated: New York, NY
   August 13, 2021        Respectfully submitted,

               HERMAN LAW

          By:  */s/ Stuart S. Mermelstein*   
               Jeff Herman
               jherman@hermanlaw.com
               *(Pending Admission)*
               Stuart S. Mermelstein
               smermelstein@hermanlaw.com
               Jason S. Sandler
               jsandler@hermanlaw.com
               434 W. 33rd St., Penthouse
               New York, NY 10001
               Telephone: (212) 390-0100

               - and –

               1800 N. Military Trail, Suite 160
               Boca Raton, FL  33431
               Telephone: (305) 931-2200

www.HermanLaw.com
Telephone: (212) 390-0100



VOICE FOR VICTIMS
HERMAN LAW